IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LEONARDO BUCCHERI, | HON. JOHN M. VAZQUEZ |
| Petitioner, | |
| | Civil Action |
| v. | No. 17-13373 (JMV) |
| PATRICK NOGAN, *et al.*, | **OPINION** |
| Respondents. | |

**VAZQUEZ, District Judge:**

## I.      INTRODUCTION

The petitioner in this matter, Leonardo Buccheri, has submitted a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (DE 1.)  For the reasons stated herein, Buccheri's petition is denied and no certificate of appealability shall issue.  Buccheri's related motion for an evidentiary hearing (at DE 16) is also denied.

## II.      BACKGROUND

On August 10, 2008, Buccheri's fiancée, Soveira Rojas ("Sophie"), died from a gunshot wound to her chest that she suffered while she and Buccheri were alone in their bedroom.  *State v. Buccheri*, No. A-1086-11T4, 2013 WL 844362, at *11 (N.J. Super. Ct. App. Div. Mar. 8, 2013).  Buccheri's position throughout has been that Sophie accidentally shot herself.  On November 17, 2009, he was nonetheless formally charged with, among other crimes, "purposefully or knowingly [causing] the death of [Sophie,]" *i.e.*, murder.  (*See* Nov. 17, 2009 Indictment, DE 13-2.)

The Honorable Joseph V. Isabella, J.S.C., presided over Buccheri's subsequent six-day jury trial in New Jersey Superior Court.  On August 13, 2010, the jury acquitted Buccheri of the

most serious charge he faced, *i.e.*, first-degree murder.[1] (*See* Aug. 13, 2010 Trial Tr. 3, DE 13-37). That same jury, however, convicted him of the lesser-included offense of second-degree passion/provocation manslaughter, as well as second-degree possession of a firearm for an unlawful purpose and fourth-degree possession of a defaced firearm. *Buccheri*, 2013 WL 844362, at *1. Then, "[a]fter the verdict was returned, [Buccheri] pled guilty to second-degree certain persons not to have weapons[.]" *Id.* at *1.

The Appellate Division, on direct appeal, summarized the evidence underlying Buccheri's convictions as follows:[2]

> According to the State's proofs, on August 10, 2008, [Buccheri, Sophie], and their children attended a summertime reunion barbeque for [Buccheri's] motorcycle club. Most people were eating, drinking and having a good time. Toward the end of the day, however, [Buccheri] and another man got into a heated verbal argument. Sophie, who appeared "intoxicated" to Harriet Collazo, the girlfriend of another club member, intervened and tackled [Buccheri] to the ground to prevent him from hitting the other man.
>
> The picnic was winding down at that point, and everyone was packing up. Another couple, Vanessa and Vic, drove [Buccheri's] seven-year-old son and three-year-old daughter, and Sophie's nine-year-old son, back to [Buccheri's] Jersey City home. As [Buccheri] and Sophie were leaving the parking lot, he drove over a concrete parking barrier and got stuck. As several people assisted in lifting the car off the barrier, Sophie got into the driver's seat to prevent [Buccheri], who she believed was drunk, from driving, and locked the door. After arguing with Sophie about who would drive,

---

[1] The jury also acquitted Buccheri "of third-degree hindering, apprehension or prosecution[.]" *Buccheri*, 2013 WL 844362, at *1 n.1.

[2] State court factual findings are presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Buccheri has not rebutted any of the Superior Court's factual findings with clear and convincing evidence, and thus, this Court is entitled to rely on those findings. The Court, having nonetheless independently reviewed the record of Buccheri's state court criminal proceedings, notes that the state courts' factual summaries of Buccheri's trial and post-conviction relief proceedings are fully consistent with – and entirely supported by – the state court record.

[Buccheri] eventually got into the passenger's seat and Sophie drove them out of the park.

Collazo and her boyfriend also headed to [Buccheri's] house and arrived about twenty minutes before [Buccheri]. Vanessa, Vic, and the children were already there. When [Buccheri] and Sophie arrived, [Buccheri] was driving. As [Buccheri] exited the car, he looked angry and had "a whole bunch of scars, scratches in his face and head," which he did not have when he got into the car at the park. Sophie's "face was blotchy" as if she had "been smacked"; her ear was red; her chest was scratched; and she was crying and holding her thumb, which was swollen. A portion of her hair had also been ripped out. Collazo consoled her while [Buccheri] brought items from the barbeque into the house. When [Buccheri] heard Sophie complaining about her hand, he said, "That ain't fucking nothing. I'm sorry. But that ain't fucking nothing, I have had worse, it will heal."

Shortly thereafter, Vanessa and Vic left, and about thirty minutes later, Collazo and her boyfriend also departed, leaving only [Buccheri], Sophie, and the three children at the house. On their return to the Bronx, Collazo's boyfriend got a phone call informing him that Sophie had died.

[Buccheri] called 911 at 7:43 p.m. and told the dispatcher, "I have an emergency, I have a gunshot wound at 312 Webster Avenue" and that "it was an accident." He reported that Sophie "shot herself by accident, she grabbed the firearm . . . she put it to herself, she pulled the trigger" and that "she's bleeding profusely, she's throwing up blood from her mouth." [Buccheri] stayed on the line as the 911 dispatcher told him to continue to monitor her condition and put a clean cloth or towel over her wound. [Buccheri] said that Sophie "was arguing, she was saying that she didn't wanna live anymore but we were at a barbeque and she was drinking a little bit." A few minutes into the call, [Buccheri] reported that Sophie had stopped breathing and that he didn't feel a pulse. He also told the dispatcher, "I don't know where the gun came from. I just empt[ied] the clip out I'm dumping all the bullets." According to the dispatcher, [Buccheri] sounded hysterical and his voice was so high-pitched that she thought he was a woman.

Jersey City police officer Kevin O'Connell was the first to respond at 7:49 p.m. When [Buccheri] eventually answered the door, he was talking on his cell phone—evidently to the 911 dispatcher—and was clearly upset and had blood on his hands, face, and clothing. Shortly thereafter, other police officers and an ambulance arrived, followed

3

by personnel from the Prosecutor's Office. [Buccheri] directed them to the upstairs middle bedroom, where O'Connell and another officer found Sophie lying in a pool of blood, not breathing, on the bedroom floor very close to the doorway. They also observed a gun and shell casing on the floor. The paramedics pronounced Sophie dead at 8:02 p.m.

Thereafter, two officers brought [Buccheri] outside and sat him in a police car with the door left open. Without being questioned, [Buccheri] started talking about the incident to Jersey City Police Detective Keith Armstrong. [Buccheri] said that he had gone down to the car to look for Sophie's ring and when he returned with it, Sophie was on the bedroom floor crying. [Buccheri] was standing in the bedroom doorway and "tried to get to [Sophie,]" but she was on the floor crying and holding the gun, stating something to the effect of "this is what [I] want."

Although [Buccheri] was not under arrest, Detective Armstrong read him his *Miranda* rights. [Buccheri] continued to talk about the incident, stating that Sophie had stood at the foot of the bed near the closet and held the gun in her right hand with her left hand over the right, and that she had the gun to her chest and cocked it back and that it must have gone off by accident. After the gun had gone off, he grabbed Sophie and held her and tried to stop the bleeding, and then called 911.

Detective Armstrong provided [Buccheri] with a written *Miranda* rights and waiver form, which he signed at 8:38 p.m. Again, without being questioned, [Buccheri] further explained that he had met Sophie through the Myspace social networking website in January 2010, and that she had been living with him for about a month. He kept the gun, a black .45-caliber handgun, which he had gotten from a former tenant who owed him money, in his top drawer loaded with eight bullets. According to Armstrong, [Buccheri] did not appear drunk or upset, but was "rambling on, stating things over and over."

Crime Scene Investigator Detective Michael Crowe arrived at the scene at around 8:58 p.m., took photographs and collected evidence. He recovered the .45-caliber handgun, which had blood stains on it, and an eight-round-capacity magazine, removed from the handgun, containing three live rounds, three blood-stained live rounds on the floor, one spent shell casing, and one spent bullet. These items were found between Sophie's body near the doorway and the bed, and not at the foot of the bed. Broken jewelry was also on the floor. No suicide note was found.

New Jersey State Police Investigator James Joyce, a firearms expert, examined the handgun, the magazine, the discharged shell and bullet, and the seven unfired cartridges collected from the scene. Joyce found that the gun was in proper working condition, and explained that it would take five-and-one-half pounds of pressure to fire it in single action (with the hammer manually cocked back), and ten pounds of pressure in double action (without the hammer cocked back). He also observed that the gun's serial number had been removed.

Joyce concluded that the bullet recovered from the scene had been discharged from the gun. Of the seven live rounds recovered, one had a small indentation suggesting that it may have been struck by the firing pin, but not with enough force to discharge the cartridge from the gun. Such a small indentation can also be made when a cartridge is cycled in the chamber of the gun. Joyce also conducted a test firing, known as a pattern test, to determine how far the front of the barrel of the gun was from its trigger when it was fired. With the same type of ammunition found at the scene, Joyce fired rounds into a cloth at three-inch intervals, beginning at "contact," where the muzzle actually touches the surface, and ending at 36 inches, at which very few particles are left around the surface. The results of that testing were then photographed and submitted to the medical examiner's office.

On August 11, 2008, Dr. Jennifer Amolat performed the autopsy of Sophie. Regional Medical Examiner/Assistant State Medical Examiner Dr. Lyla E. Perez, who was in charge when the autopsy was conducted, and who testified at trial, also examined the body and reviewed Dr. Amolat's autopsy report, which included photographs taken during the examination. Both Dr. Amolat and Dr. Perez determined the cause of death to be a gunshot wound to the upper right chest.

The manner of death was left pending because the autopsy findings were inconsistent with other information the medical examiner's office had received indicating the manner of death was suicide. Yet, the absence of gunpowder inside the bullet wound indicated that the gun was not pressed tightly against the skin when it was fired. Instead, there was stippling, or gunpowder residue, around the entry wound, which Dr. Perez testified is unusual for suicide wounds. The short exit wound indicated that Sophie's back was pressed against a very hard object, which Dr. Perez testified would not have been the floor.

On October 20, 2008, Dr. Perez determined the manner of death to be homicide based on the distance of the muzzle and the positioning of the gun. She formed this opinion only after she compared the autopsy photographs with the results of the test firing performed on the gun, which led her to conclude that the muzzle of the gun had been three to six inches away from where the bullet entered Sophie when it was fired, and that the stippling was perpendicular to the skin. She thus concluded that, in her opinion, it is "very unlikely that a person shooting herself will hold the gun—the gun at that particular angle and cause this gunpowder residue, stippling. It is usually very much a contact wound when there is a suicidal shot."

The autopsy also turned up evidence that Sophie died from aspirating blood, in which case her death would not have been instantaneous. Dr. Perez testified that it may have taken a "few minutes" for Sophie to die after being shot.

The examination also exposed other injuries to Sophie, namely, bruises and scrapes on her earlobe, thumb, arms, elbow, feet, and knees, as well as a broken fingernail. There was also subcutaneous bleeding in her lower abdomen that was most likely the result of blunt force trauma. The injuries were consistent with a physical struggle.

The toxicology report revealed that Sophie had a blood-alcohol level of 0.125. Although Sophie's hands were swabbed for gunpowder residue, no tests were conducted on that evidence. Nor was the gun tested for fingerprints.

*Id.* at *1-4.

Three days after the jury returned its verdict, Buccheri, on August 16, 2010, filed a motion for a judgment of acquittal and a new trial. (*See* Trial Court's Nov. 16, 2010 Op. 2, DE 13-16 at PageID: 510.) During the November 16, 2010 hearing on that motion, Buccheri's trial counsel, A. Paul Condon, among other things, noted the critical nature of Dr. Perez's testimony in securing Buccheri's manslaughter conviction, claimed that her testimony constituted an impermissible net opinion, and requested that Buccheri therefore be acquitted of manslaughter notwithstanding the jury's verdict. (*See*, *generally*, Nov. 16, 2010 Hr'g Tr., DE 13-38.) Judge Isabella denied

Buccheri's motion by way of a written opinion issued later that day. (DE 13-16 at PageID: 509-19.)

On May 13, 2011, Judge Isabella "sentenced [Buccheri] on the manslaughter conviction to a ten-year term with an eighty-five percent parole ineligibility . . . ; a concurrent eighteen-month term on the fourth-degree weapons offense; and a consecutive five-year term with a five-year period of parole ineligibility on the 'certain persons' offense. [Buccheri's] aggregate sentence then was a fifteen-year term, thirteen and one-half years to be served without parole." *Buccheri*, 2013 WL 844362, at *1. The Appellate Division affirmed Buccheri's conviction and sentence on March 8, 2013. *Id.* The New Jersey Supreme Court denied certification of Buccheri's direct appeal on October 3, 2013. *State v. Buccheri*, 75 A.3d 1161 (N.J. 2013) (table).

On November 25, 2013, Buccheri filed an application for post-conviction relief ("PCR") in Superior Court's Law Division (hereinafter, the "PCR court"). (*See*, *e.g.*, PCR court's July 19, 2015 Op. 2, DE 13-19; *accord* Pet'r's Nov. 25, 2013 PCR Br. 5, DE 13-8.) Buccheri argued to the PCR court that his trial counsel, Condon, was ineffective because he "failed to investigate and proffer [a] medical expert to testify in support of his defense at trial[] that [Sophie] shot herself[.]" (DE 13-19 at 9; *accord* DE 13-8; Pet'r's Nov. 24, 2014 PCR Br. 47-50, DE 13-15.)

On or about September 22, 2014, Buccheri's PCR counsel, Craig S. Leeds, filed a motion to compel Condon to produce a full and complete copy of Condon's criminal trial file. (DE 13-9.) By way of a letter date October 7, 2014, Leeds advised the PCR court that the purportedly "entire file" which Condon produced did not contain any time sheets or a copy of the parties' retention agreement. (DE 13-10.) Buccheri claimed that these documents were critical for purposes of substantiating his ineffective assistance claim because they would demonstrate what steps, if any, Condon agreed to and/or did take with respect to his investigation and retention of an expert to

refute Dr. Perez's testimony. (*See* Oct. 10, 2014 Hr'g Tr. 5-6, DE 13-40.) Judge Isabella, then sitting as judge of the PCR court, held a hearing on this issue on October 10, 2014. (*Id.*) At that hearing, Condon – through another attorney at his firm – represented that there were no time sheets to produce due to the parties' flat fee arrangement. (*Id.*at 7.) In accepting that representation as true, Judge Isabella noted that he "knew there was no time sheets[.]" (*Id.*) With respect to the parties' retention agreement, Condon took the position that he was not required to provide this document to Leeds because it "is not part of the trial file[,]" but nonetheless provided a copy of the agreement to the PCR court for *in camera* review. (*Id.* at 9-10.) On October 23, 2014, the PCR court issued an order denying Leeds's request for a copy of the retainer agreement "as it [did] not contain any relevant information[.]" (DE 13-12.)

Thereafter, on April 6, 2015, the PCR court conducted a non-evidentiary hearing[3] on the merits of Buccheri's PCR application. (Apr. 6, 2015 Hr'g Tr., DE 13-41.) On June 19, 2015, the PCR court entered an order denying Buccheri's PCR petition for the reasons set forth in its accompanying opinion. (DEs 13-18 and 13-19, respectively.) The Appellate Division affirmed that denial on April 3, 2017. *State v. Buccheri*, No. A-1482-15T3, 2017 WL 1207981, at *1 (N.J. Super. Ct. App. Div. Apr. 3, 2017). The New Jersey Supreme Court denied certification of Buccheri's PCR appeal on July 20, 2017. *State v. Buccheri*, 182 A.3d 1280 (N.J. 2017) (table).

Buccheri filed his § 2254 petition on December 8, 2017.[4] (DE 1.) Respondents submitted their answer on June 18, 2018. (DE 13.) Buccheri filed his traverse, *i.e.*, reply, on or about July

---

[3] To clear, the PCR court denied Buccheri's PCR application "without an evidentiary hearing." *Buccheri*, 2017 WL 1207981, at *1.

[4] December 8, 2017 is the date on which Buccheri executed his habeas pleading. (*See* DE 1 at 17.) Under the federal prisoner mailbox rule, "a document is deemed filed on the date it is given to prison officials for mailing." *Pabon v. Mahanoy*, 654 F.3d 385, 391 n. 8 (3d Cir. 2011). The

5, 2018. (DE 15.) Thereafter, on or about February 20, 2019, Buccheri filed a motion formally requesting that this Court hold an evidentiary hearing with respect to his § 2254 ineffective assistance of counsel claim. (DE 16.)

## III.  STANDARD OF REVIEW

This Court can only grant habeas relief to a person in custody under judgment of a state court for violations of the Constitution, laws, or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Buccheri filed his § 2254 petition after April 24, 1996; thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).

Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d). This Court must accordingly "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable-application inquiry should ask whether the state court's

Court, affording Buccheri all favorable inferences, finds that December 8, 2017 represents the date on which he initiated this action.

application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Critically, "a federal court may not [grant habeas relief] because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The habeas petitioner bears the burden of proof in a § 2254 proceeding and, with respect to § 2254(d)(1), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, this Court will assume that, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018). Additionally, AEDPA deference is not excused when state courts issue summary rulings. For example, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 62 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State."

28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citation omitted). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citations omitted). To the extent that a petitioner's constitutional claims are unexhausted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005).

## IV.    ANALYSIS

Buccheri raises the following points for this Court's review:

> Ground One: [Buccheri] was denied his Sixth Amendment right to effective assistance of counsel during criminal proceedings and trial; trial counsel failed to consult with an[d] obtain a medical expert to investigate the forensics of shooting incident which prejudiced [Buccheri's] defense and violated his due process right to a fair trial.
>
> Ground Two: Without medical basis the medical examiner testified that the gunshot "was not self-inflicted," thus directly contradicting the defense's claim [that] it was self-inflicted.
>
> Ground Three: The jury should have been charged on the affirmative defense of prevention of suicide under N.J.S.A. 2C:7-7e.
>
> Ground Four: There was insufficient evidence to warrant an instruction and conviction on passion provocation manslaughter.
>
> Ground Five: It was flagrant misconduct for the prosecutor to manufacture the charge that [Buccheri] "waited until [Rojas] was dead to call 911."

(Pet'r's § 2254 Br. at i, DE 1-1.)

## A. Ground Two: Buccheri's Challenges to Dr. Perez's Trial Testimony

Buccheri, in Ground Two, claims that "the medical examiner[, Dr. Lyla E. Perez,] testified [without medical basis] that [Sophie's gunshot] 'was not self-inflicted,' thus directly contradicting

the defense's claim [that] it was self-inflicted." (DE 1-1 at 8.) He asserts that the "[a]dmission of [Dr. Perez's] net opinion [testimony] violated his constitutional rights to due process and a fair trial."[5] (*See* Pet'r's Direct Appeal Br. 22, DE 13-4; DE 1-1 at 8 (incorporating the same arguments in support of this claim that he advanced on direct appeal).) In short, Buccheri is challenging the admission of Dr. Perez's expert testimony at trial.

The admissibility of evidence at a state criminal proceeding is normally considered a question of state law which is not cognizable on federal habeas review. *See Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); *accord Marshall v. Lonberger*, 459 U.S. 422, 438 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules"); *see also Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991); *Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009). A § 2254 petitioner may nonetheless be entitled to federal habeas relief based a state court's purportedly improper evidentiary rulings, if, and only if, he can show that the admission of that challenged evidence deprived him of the "fundamental elements of fairness in [his] criminal trial[,]" thereby violating his Fourteenth Amendment right to due process. *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)).

---

[5] In that respect, Buccheri specifically avers, among other things, that (1) "[Dr. Perez's] net opinion that the injury was not self-inflicted is sloppy, imprecise, and unsupported, and effectively negated Buccheri's defense" (see DE 13-4 at 22); (2) Dr. Perez's testimony that, in her expert opinion, Sophie did not shoot herself and was instead a homicide victim "violated [Buccheri's] right to have the jury fairly evaluate the merits of his defense" (*id.* at 25); and (3) "because [Perez was] an experienced and well-credentialed expert, [her opinion] likely carried great weight with the jury and had a devastatingly prejudicial effect." (*Id.* at 22.)

Pertinently, "[t]he Supreme Court has 'defined the category of infractions that violate 'fundamental fairness' very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 443 (1992)).  Indeed, "[i]n order to satisfy due process, [a petitioner's] trial must have been fair, it need not have been perfect." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)).  In the context of a state court evidentiary ruling, a due process violation will only be found if that ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." *Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994)).

It is against this backdrop that this Court considers the extensive analysis and findings made by the Appellate Division in rejecting Buccheri's Ground Two arguments on direct appeal:

> [Buccheri] contends it was reversible error to admit Dr. Perez's expert testimony because it critically failed to account for the possibility of an accidental shooting.  As such, the omission of this vital link reduces the expert's testimony to no more than a "net opinion."  We disagree.
>
> In the first place, no such objection was voiced during Dr. Perez's testimony, and only raised for the first time during the post-verdict motion for a new trial, when it was soundly rejected.  And for good reason.  The key issue at trial was whether the gunshot wound was self-inflicted or caused by [Buccheri].  In opining about the manner of death, Dr. Perez ruled out both "suicide" and "self-inflicted" injury.  To be sure, Dr. Perez never explicitly discussed the possibility that Sophie accidentally shot herself, nor did she expressly indicate whether she meant "self-inflicted" to encompass accidental self-inflicted injury or was simply using the term interchangeably with "suicide."  However, by concluding that the death was a homicide, Dr. Perez clearly implied that the death was not self-inflicted, either intentionally or unintentionally.  Indeed, in determining the victim's death to be a homicide, Dr. Perez testified that it is "very unlikely that a person shooting herself" would have held the gun from that angle and distance.  This reasoning seems no less applicable to an unintentional self-inflicted bullet wound.

But even assuming the expert failed to rule out an accidental self-inflicted shooting, that fact does not render her opinion an inadmissible "net opinion." As a threshold matter, it is undisputed that Dr. Perez was qualified to offer her expert opinion as to the cause and manner of death, and she testified to such without objection, based on her occupational experience and specialized scientific knowledge in forensic pathology acquired over many years. *See Bellardini v. Krikorian*, 222 N.J. Super. 457, 463 (App. Div. 1988); *Correa v. Maggiore*, 196 N.J. Super. 273, 282 (App. Div. 1984).

In addition to her qualifications to testify as an expert, Dr. Perez formed her opinion as to the cause and manner of death based on facts and data. *See* Biunno, Current N.J. Rules of Evidence, comment 2 on N.J.R.E. 702 (2002). N.J.R.E. 703 provides the permissible bases of expert opinion:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

As construed by applicable case law, N.J.R.E. 703 requires that an expert's opinion be based on facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial. *Buckelew v. Grossbard*, 87 N.J. 512, 524 (1981); *Nguyen v. Tama*, 298 N.J. Super. 41, 48-49 (App. Div. 1997). In this regard, the facts need not be admissible in evidence if they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *State v. McBride*, 213 N.J. Super. 255, 269 (App. Div. 1986) (internal quotation marks omitted); *see also State v. Townsend*, 186 N.J. 473, 494 (2006).

Conversely, an expert opinion lacking in such foundation and consisting of bare conclusions unsupported by factual evidence, or by reasonable inferences drawn from the record, is inadmissible as a "net opinion." *Johnson v. Salem Corp.*, 97 N.J. 78, 91 (1984); *Buckelew*, *supra*, 87 N.J. at 524; *Rosenberg v. Tavorath*, 352 N.J. Super. 385, 401 (App. Div. 2002). The net opinion rule requires an expert "to give the why and wherefore" of his or her opinion, rather than a mere conclusion. *Jimenez v. GNOC, Corp.*, 286 N.J. Super. 533, 540 (App. Div.), *certif. denied*, 145 N.J. 374 (1996), *overruled in part on other grounds*, *Jerista v. Murray*, 185 N.J. 175 (2005). A

trial court "may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified." *Pomerantz Paper Corp. v. New Cmty. Corp.*, 207 N.J. 344, 373 (2011).

In this regard, in denying [Buccheri's] motion for a new trial based on the claim that Dr. Perez offered a net opinion, the judge found:

> In this case, the record is clear that the expert's testimony was based on the factual data gathered from the deceased's autopsy. The State's expert, Dr. Lyla Perez, personally reviewed the autopsy performed by Dr. Jennifer Amolat; thus, it follows that Dr. Perez's testimony was based on facts and data perceived by her through the victim's autopsy, which was itself performed by a doctor qualified to conduct autopsies.
>
> Furthermore, Dr. Perez testified that she discussed her opinion with Dr. Jennifer Amolat. . . .
>
> Finally, Dr. Perez testified that she based her opinion on her observance of pictures of the gunshot wound. As stated before, an expert may be qualified to give their opinion based on occupational experience or knowledge acquired over a period of years; Dr. Perez clearly falls within this category, having previously conducted numerous autopsies on gunshot victims[.]

The judge went on to state that Dr. Perez "testified in detail about the gunshot [wound] to the chest suffered by the victim," including "the appearance of the stippling around the wound, the location of the entrance wound, the angle of the entrance of the wound, the abraded and contused [exit] wound, and finally a review of gunshot pattern testing which was conducted by the State Police."

We agree. Dr. Perez relied on her extensive experience in forensic pathology, her personal observations, and facts and data supplied to her by others in reaching her conclusion that Sophie's manner of death was homicide. While she did not conduct the autopsy of Sophie herself, she examined the body and reviewed the autopsy report and photographs taken during the examination, and performed her own independent analysis comparing the results of the autopsy with the results of a test firing on the gun.

Despite the fact that Dr. Perez provided a factual basis and supporting data for her opinion, [Buccheri] ascribes fatal fault to her failure to account for the possibility that Sophie accidentally shot herself. Yet, "[t]he failure of an expert to give weight to a factor thought important by an adverse party does not reduce [her] testimony to an inadmissible net opinion if [s]he otherwise offers sufficient reasons which logically support [her] opinion." *Rosenberg*, *supra*, 352 N.J. Super. at 402; *see also State v. Freeman*, 223 N.J. Super. 92, 115-16 (App. Div. 1988), *certif. denied*, 114 N.J. 525 (1989). "Rather, such an omission merely becomes a proper 'subject of exploration and cross-examination at a trial.'" *Rosenberg*, *supra*, 352 N.J. Super. at 402 (quoting *Rubanick v. Witco Chem. Corp.*, 242 N.J. Super. 36, 55 (App. Div. 1990), *mod. on other grounds*, 125 N.J. 421 (1991)); *see also Hisenaj v. Kuehner*, 194 N.J. 6, 23-25 (2008).

Nor does an expert have to produce more evidence than is necessary to support her opinion. *Glenn Wall Assocs. v. Twp. of Wall*, 99 N.J. 265, 280 (1985). Rather, "[i]nsufficient factual support for an opinion undermines its foundation and justifies its rejection by the trier of fact." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, comment 4 on N.J.R.E. 703 (2012) (citing *Champion Dyeing & Finishing Co. v. Centennial Ins. Co.*, 355 N.J. Super. 262, 273-74 (App. Div. 2002)).

We reiterate that an expert's testimony is not inadmissible merely because it fails to account for some particular condition or fact which the adversary considers relevant. The adversary may on cross-examination supply the omitted conditions or facts and then ask the expert if his opinion would be changed or modified by them. *See State v. Doyle*, 77 N.J. Super. 328, 339 (App. Div. 1962), *aff'd*, 42 N.J. 334 (1964). Thus, even assuming that Dr. Perez's findings did not consider the possibility of an "accidental" self-inflicted wound, this would have been an appropriate matter to ask the expert about on cross-examination.

In fact, on cross-examination, Dr. Perez made clear that the absence of a close contact wound does not completely rule out suicide as a possibility, but is "inconsistent" with suicide. Dr. Perez admitted that even a small person could grip the gun and point it at themselves with the muzzle three to six inches away. She opined, however, that it is "very unlikely that a person shooting herself will hold . . . the gun at that particular angle and cause this much gunpowder residue, stippling."

In *Polyard v. Terry*, 160 N.J. Super. 497 (App. Div. 1978), *aff'd o.b.*, 79 N.J. 547 (1979), we reiterated the well-established principle that:

> it is within the special function of a jury to decide if the facts on which the answer of an expert is based actually exists, and the value or the weight of the testimony of the expert is dependent upon and no stronger than the facts on which it is predicated.

> [*Id.* at 511 (internal quotation marks omitted).]

In other words, it is for the jury to determine the credibility, weight and probative value of the expert's testimony. *Hisenaj*, *supra*, 194 N.J. at 23-25; *Savoia v. F.W. Woolworth Co.*, 88 N.J. Super. 153, 162 (App. Div. 1965). The opinion of an expert can rise no higher than the facts and reasoning upon which it is based. *Johnson*, *supra*, 97 N.J. at 91. Indeed, even if the testimony of an expert is uncontradicted, it is still for the jury to exercise its independent judgment in considering the matter. *Chattin v. Cape May Greene, Inc.*, 216 N.J. Super. 618, 640 (App. Div.), *certif. denied*, 107 N.J. 148 (1987).

Here, the trial judge correctly instructed the jury on its proper role. The judge twice gave the jurors the model charge on expert testimony, explaining that the jury is not bound by an expert's opinion and may give it as much weight as they think is proper. The judge told the jurors that in reaching that determination, they may consider the reasons given for the opinion, the qualifications and credibility of the expert, and the facts upon which the opinion is based.

Moreover, Dr. Perez was subject to cross-examination and the defense had every opportunity to undermine her opinion and draw out the distinction between intentional and accidental self-inflicted injury. In fact, as noted, on cross-examination, Dr. Perez admitted that it was possible Sophie held the gun at the distance it was determined to be from her body and that "it is certainly a possibility that it was a suicide or by the hand of the decedent."

Under all of these circumstances, we conclude that the absence of any reference to an accidental self-inflicted wound does not reduce Dr. Perez's testimony to an inadmissible net opinion. The expert gave sufficient reasons, based on facts and data, to logically support her opinion.

*Buccheri*, 2013 WL 844362, at *5-8.

As noted above, in the context of a state court evidentiary ruling, a criminal defendant's Fourteenth Amendment right to due process will be violated only when the decision on the challenged evidence was so arbitrary or prejudicial that it deprived him of "fundamental elements of fairness in [his] criminal trial." *Glenn*, 743 F.3d at 407. The record of Buccheri's state court proceeding precludes this Court from making such a finding. First, this Court perceives no clear error by the state courts with respect to the admission of Dr. Perez's expert testimony at trial. Indeed, the Court agrees with the Appellate Division that the applicable state law considerations, detailed above, fully supported the admission of that testimony.

Moreover, Buccheri has in no way shown that the Appellate Division's adjudication of his evidentiary-based challenges to Perez's testimony "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. 2254(d)(1); *accord Aquilina v. Anderson*, No. 17-2243, 2017 WL 6209208, at *6 (D.N.J. Dec. 7, 2017) ("Having reviewed the record, it is clear that Dr. Siek's testimony at trial . . . was based on the evidence and was neither a net opinion nor an ultimate opinion as to Petitioner's guilt. As such, it does not appear that the state courts erred in admitting this evidence, and it is in any event clear that the admission of Dr. Siek's testimony did not deprive Petitioner of fundamental fairness in her trial. Petitioner is therefore not entitled to habeas relief as to the admission of [Dr. Siek's] testimony."), *cert. of appealability denied sub nom. Aquilina v. Adm'r Edna Mahan Corr. Facility*, No. 17-3799, 2018 WL 3089198 (3d Cir. May 4, 2018), *cert. denied sub nom. Aquilina v. Davis*, 139 S. Ct. 571 (2018).

Insomuch as Buccheri, by way of Ground Two, also incorporates his additional direct appeal assertion that Dr. Perez's testimony "violated [his Sixth Amendment] right to confront the witnesses against him" (DE 1-1 at 8 (incorporating the same arguments in support of Ground Two

that Buccheri raised in his direct appeal brief at pages 16-25); DE 13-4 at 24-25 (specifically claiming that Dr. Perez's testimony violated the Confrontation Clause)), that claim likewise fails to support an award of habeas relief. The Confrontation Clause of the Sixth Amendment, applicable to the States through the Fourteenth Amendment, requires that a criminal defendant be given the right "to be confronted with the witnesses against him." U.S. Const. amends. VI, XIV; *see also Richardson v. Marsh*, 481 U.S. 200, 206 (1987). The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 56 (2004); *see also Davis v. Washington*, 547 U.S. 813 (2006).

In analyzing such a claim on habeas review, a federal court must initially determine whether the challenged statement "qualifies as testimonial[.]" *United States v. Moreno*, 809 F.3d 766, 773 (3d Cir. 2016) (citing *Davis*, 547 U.S. 813). "[S]tatements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial are testimonial." *Id.* (citing *United States v. Hinton*, 423 F.3d 355, 360 (3d Cir. 2005)). "The core class of testimonial statements includes 'material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [it also includes] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" *Id.* at 773-74 (citing *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009)). If, and only if, the challenged "statement is testimonial, then the Confrontation Clause requires unavailability and a prior opportunity for cross-

examination" before that statement can be admitted at trial. *Id.* at 774 (citations and internal quotations omitted). As the Supreme Court noted in *Williams v. Illinois*, 567 U.S. 50 (2012):

> The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions. In all but one of the post-*Crawford* cases in which a Confrontation Clause violation has been found, both of these characteristics were present. *See Bullcoming*[ *v. New Mexico*, 564 U.S. 647, 651-52 (2011)] (certified lab report having purpose of showing that defendant's blood-alcohol level exceeded legal limit); *Melendez-Diaz*, [557 U.S. at 308] (certified lab report having purpose of showing that substance connected to defendant contained cocaine) . . . .

*Williams*, 567 U.S. at 82-83.

Importantly, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *DeJesus v. D'Ilio*, No. 13-5778, 2017 WL 66391, at *10 (D.N.J. Jan. 6, 2017) (citing *Crawford*, 541 U.S. at 59 n.9); *see also Adamson v. Cathel*, 633 F.3d 248, 256 (3d Cir. 2011) ("Even after *Crawford*, however, '[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'"). The Appellate Division, in accordance with the foregoing considerations, analyzed Buccheri's Confrontation Clause claim as follows:

> [Buccheri] contends that Perez's reference to "police report[s], statement[s], witnesses" in forming her expert opinion violated [his] Sixth Amendment right of confrontation by allowing the jury to speculate that the State had additional evidence of her guilt not presented at trial. We disagree.
>
> [Buccheri] never objected to this brief portion of Dr. Perez's testimony, [N.J. Ct. R.] 1:7-2, and therefore his belated claim on appeal is governed by the plain error standard, [N.J. Ct. R.] 2:10-2; *State v. Winder*, 200 N.J. 231, 252 (2009).

Moreover, defense counsel asked Dr. Perez on cross-examination about other information she considered in reaching her ultimate conclusion, information defense counsel characterized as "not science." She testified that she considered "police reports and evidence, as well as testimony." The prosecutor objected, but neither the basis for that objection nor the sidebar that followed are part of the record. Defense counsel then had Dr. Perez confirm again that she did not include what evidence she reviewed in reaching her conclusion in any report. On re-direct, Dr. Perez testified that this "other information" consisted of reports from medical examiner's office investigators who went to the crime scene, crime scene photographs, police reports, and the test pattern results.

[Buccheri] now presents [his] Confrontation Clause challenge for the first time. While it is true that the State may not suggest that it has information of [Buccheri's] guilt it had not presented to the jury, *State v. Branch*, 182 N.J. 338, 351-52 (2005); *State v. Bankston*, 63 N.J. 263, 268-69 (1973), that is not what occurred here. Dr. Perez did not convey the substance of those "reports" or "statements" to the jury, nor act as their "conduit," but rather gave an independent expert opinion based on her review of that material and, far more importantly, her own independent testing—namely a personal examination of the body and autopsy photographs—and her comparison of those photos with the results of firearm pattern testing testified to by another expert at trial, all sources typically relied on by those in her field. *See State v. Torres*, 183 N.J. 554, 576-79 (2005).

As noted, as a qualified expert, Dr. Perez was permitted to consider facts and data, such as police reports and witness statements, not otherwise admissible but of the type reasonably relied upon by experts in the same field. N.J.R.E. 703; *Torres*, *supra*, 183 N.J. at 576-79. An expert "is generally permitted to detail for the trier of fact all of the materials, including films, test results, hospital records, and other experts' reports, on which he relied." *Agha v. Feiner*, 198 N.J. 50, 62 (2009).

More importantly, Dr. Perez did not offer this other information for the truth of the matter asserted therein. She was only responding to defense counsel's question about what information, if any, she relied on for her opinion other than the autopsy and test firing results. And in this regard, viewing Dr. Perez's testimony in its entirety, it is clear that in reaching her conclusion that Sophie's death was a homicide, she primarily relied on her own physical examination and comparison of the test firing results with the autopsy photos,

rendering her reference to the other information harmless at worst, [N.J. Ct.] R. 2:10-2; *State v. Heisler*, 422 N.J. Super. 399, 423 (App. Div. 2011), and clearly incapable of leading the jury to a result it otherwise would not have reached, *Winder*, *supra*, 200 N.J. at 252. Under the circumstances, Perez's reference to this other information did not violate the Confrontation Clause.

Nor did Dr. Perez's reliance on Dr. Amolat's autopsy report, an aspect never challenged by [Buccheri] below or even on appeal. *See State v. Williams*, 212 N.J. 103 (2012) (grant of certification limited to the constitutional issue of "whether the admission of the testimony by the pathologist who did not perform the autopsy violated defendant's right of confrontation").

Here, Dr. Perez was the supervisor in the office and in charge of the examination. She was present at certain times during the autopsy and personally examined the body. Indeed, she "probably did" view the body when some of the photographs in the autopsy report were taken, because staff performing the autopsy would call her in at times to ask questions. Dr. Perez also reviewed the photographs and results of the final autopsy report independently and with Dr. Amolat. Moreover, Dr. Perez did not merely rely on Dr. Amolat's autopsy report but performed her own independent analysis, comparing, most critically, the autopsy photographs with the test firing results. Accordingly, unlike the testifying experts in *Bullcoming*, [564 U.S. 647, 651], and *Williams*, [567 U.S. 50, 56], Dr. Perez's supervisory role and involvement was active, direct and meaningful, more than sufficient to allay any concerns (not, by the way, voiced by defendant herein) that she was acting simply as a conduit or stand-in for a non-testifying expert. Once again, we perceive no Confrontation Clause violation in her testimony.

*Buccheri*, 2013 WL 844362, at *8-9.

For substantially the same reasons detailed by the Appellate Division, this Court agrees that Dr. Perez's testimony did not violate the Confrontation Clause. There is no question that Perez's expert opinion was informed by her review of Dr. Amolat's autopsy report, crime scene photographs, police reports, gunshot test pattern results, and reports prepared by other investigators present at the crime scene. Those materials were entirely proper for Perez to consider. Moreover, the record unequivocally shows that none of those documents were introduced at trial in a manner

which even remotely suggested to the jury that a third-party, by way of those reports, also concluded that Buccheri shot Sophie. (*See* Aug. 10, 2010 Trial Tr. 93-162, DE 13-34.) Instead, Dr. Perez's conclusion that Sophie's gunshot wound was not self-inflicted was the result of her own independent analysis of the objective information contained in those materials, *i.e.*, these documents were not used at trial in a manner which implicated the Confrontation Clause. (*See id.* at 123-154.)

This Court finds, based on the foregoing considerations, that the Appellate Division's determination that it "perceive[d] no Confrontation Clause violation in [Perez's] testimony" was not an unreasonable application of *Crawford* and its progeny. *See Gant v. Giroux*, No. 15-4468, 2017 WL 2825927, at *21 (E.D. Pa. Feb. 27, 2017) ("The forensic medical examiner who performed the autopsy . . . was not available for trial, as he no longer worked for the [state]. The prosecution did not merely submit [the unavailable doctor's] report. Instead, [it] called Dr. Ian Hood, who was present when the autopsy was conducted, reviewed [the unavailable doctor's] report, and independently arrived at his own determination of the cause of death. Dr. Hood was thoroughly cross-examined by defense counsel, and the [state] court, after review of the entire record, found that Dr. Hood was qualified to testify as to his expert opinion. Nothing in . . . in *Crawford* or *Melendez-Diaz* clearly established that such a procedure violates the Sixth Amendment."), *report and recommendation adopted*, 2017 WL 2797911 (E.D. Pa. June 28, 2017). Buccheri, for his part, cites no clearly established Supreme Court precedent which supports a different conclusion. *Accord Johnston v. Mahally*, 348 F. Supp. 3d 417, 435 (E.D. Pa. 2018) ("[T]here is no "clearly established Federal law" or "squarely established" rules concerning autopsy reports.") The Court will accordingly deny habeas relief on this portion of Buccheri's Ground Two claim. *Id.* at 426, 435 (denying habeas relief to petitioner who claimed, among other

things, that a medical examiner who was not directly involved in performing autopsies on two victims violated the Confrontation Clause when he rendered expert testimony on the victims' cause and manner of death based on photographs of the corpses, toxicology reports, and the autopsy reports prepared by his former colleagues); *Gant*, 2017 WL 2825927, at *21.

As the foregoing demonstrates, all of Buccheri's Ground Two arguments were "adjudicated 'on the merits' in state court" and Buccheri has failed to demonstrate that "the state court's adjudication [of either his evidentiary-based or his Confrontation Clause-rooted challenges to Dr. Perez's testimony] 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law.'" *See Johnson v. Lamas*, 850 F.3d 119, 133-34 (3d Cir. 2017) (quoting 28 U.S.C. 2254(d)(1)). Buccheri's Ground Two arguments accordingly fail to provide a basis for habeas relief.

**B. Ground One: Ineffective Assistance of Trial Counsel**

Buccheri claims that he received constitutionally deficient legal representation at trial because his trial attorney, A. Paul Condon, "failed to consult with [and] obtain a medical expert to investigate the forensics of [Sophie's shooting]." (DE 1-1 at 7; *accord* Pet'r's July 5, 2018 Traverse 1, DE 15.) Buccheri relatedly requests that this Court hold an evidentiary hearing so that he can develop the factual basis for this claim. (DE 16.)

Buccheri's ineffective assistance of counsel ("IAC") claim is governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984); *accord Lewis v. Johnson*, 359 F.3d 646, 656 (3d Cir. 2004). Under *Strickland*, a habeas petitioner first "must show that counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d

Cir. 2007). With respect to evaluating whether counsel's performance was deficient under *Strickland*, the "proper standard . . . is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential [and] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Pursuant to *Strickland*, a habeas petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299. In other words, a petitioner must additionally demonstrate that counsel's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 692-93. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Shedrick*, 493 F.3d at 299.

Several additional considerations bear on the Court's resolution of Buccheri's IAC claim. First, under *Strickland*, defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Second, when evaluating a failure to investigate claim, the Court "[applies] a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. That said, because "the

question of whether counsel had a reasonable strategy necessarily includes the question of whether that strategy was reasonably arrived at[,]" *see Collins v. Sec'y of Pennsylvania Dep't of Corr.*, 742 F.3d 528, 547 (3d Cir. 2014), *cert. denied sub nom. Collin v. Wetzel*, 135 S. Ct. 454 (2014), "[o]nly choices made after a reasonable investigation of the factual scenario are entitled to a presumption of validity." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006); *accord Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

Lastly, and most critically, "[w]hen a federal habeas petition under § 2254 is based upon an [IAC] claim, '[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable,' which 'is different from asking whether defense counsel's performance fell below *Strickland*'s standard.'" *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington*, 562 U.S. at 101). "Federal habeas review of ineffective assistance of counsel claims is thus 'doubly deferential.'" *Id.* (quoting *Cullen*, 563 U.S. at 190).

As noted above, Buccheri avers that Condon's failure to seek, obtain or consult with a forensics expert whom he could call as a witness to rebut Dr. Perez's testimony prejudiced his defense and denied him a fair trial. (DE 15 at 4.) The PCR court made the following specific findings in rejecting that claim:

> In this matter, [Buccheri] maintains that he was denied the right to effective assistance of trial counsel guaranteed by the Sixth Amendment . . . [because] counsel failed to investigate and proffer a medical expert to testify in support of his defense at trial[, *i.e.*,] that the victim shot herself . . . . Relief is only granted in post-conviction proceedings only in exceptional circumstances, upon a showing of fundamental injustice or constitutional error.
>
> . . . .
>
> [Buccheri's] claim lies thoroughly unsubstantiated under the requirements of [*Strickland*] and a *prima facie* claim for post-

conviction relief has not been established. [Buccheri] claims that [Condon] was ineffective for failing to obtain a medical expert as part of his defense. At trial, the parties' positions were clear: either [Buccheri] shot [Sophie], as the State presented; or [Sophie] shot herself, which was [Buccheri's] defense. In support of its claim, the State called Dr. Lyla Perez to testify as an expert in forensic pathology; Dr. Perez was qualified without objection. Dr. Perez began her testimony by detailing her professional training and extensive experience in the field of forensic pathology. Dr. Perez testified having performed over 6,000 autopsies during her thirty year career as a medical examiner; she also noted her current appointment as the Regional Medical Examiner and Assistant State Medical Examiner.

Dr. Perez's testimony strongly supported the State's position that [Sophie] had not died of a self-inflicted wound, but, rather was the victim of homicide. Dr. Perez formed her conclusion that the manner of death was in-fact homicide based on several findings derived from the autopsy. Dr. Perez noted the absence of gunpowder residue within the wound, which she testified indicated that the shot fired was not a "tight contact wound" or a shot where the barrel of the gun was pressed against the skin. Dr. Perez also testified that autopsy results indicated "stippling," had occurred, whereby the entrance wound was surrounded by gunpowder tattooing. Dr. Perez additionally testified that the stippling around the wound was of equal circumference, indicating that the shot was fired at a perpendicular angle to the skin, precisely 90 degrees. Dr. Perez testified that the firearm had been fired at a distance of three to six inches from [Sophie's] chest. Based on these findings, Dr. Perez concluded that in her opinion, which she noted to be an opinion based upon performing thousands of autopsies, several hundred of which were suicides, that the matter of death was homicide. Dr. Perez stated, "I determined it to be a homicide because it is very unlikely that a person shooting herself will hold the gun – the gun at that particular angle and cause this gunpowder stippling. It is usually very much a contact wound when there is a suicidal shot." Dr. Perez's testimony supported the State's position that [Buccheri] shot [Sophie] and contrasted the defense's theory of suicide.

Through his [PCR application, Buccheri] now claims that [Condon] was ineffective because he should have called a medical expert to rebut Dr. Perez's testimony. [Buccheri] claims that there were no eyewitnesses to this incident, aside from [himself]. [Buccheri] contends that he believed that [Condon] would seek an expert to testify on his behalf to support [the] defense's position that [Sophie]

shot herself. [Buccheri] claims that but for [Condon's] failure to retain, and thereafter proffer, an expert witness on his behalf that could have contested the findings of Dr. Perez that this was a homicide, the result would have been different. Although [Buccheri] claims that [Condon] was *per se* deficient for not calling a medical expert to rebut, he has not provided an argument to sustain his contention.

Additionally, [Buccheri's] contention is at odds with the record, which demonstrates [Condon's] attempt at counteracting Dr. Perez's testimony. As the record portrays, when presented with the testimony of Dr. Perez, [Condon] took efforts to scrutinize and discredit the conclusions Dr. Perez formed. Further, [Condon] asked Dr. Perez [approximately 187] questions on cross-examination. Via his questioning, [Condon] was able to highlight to the jury that Dr. Perez did not conduct the autopsy that her testimony relied upon. During cross-examination, [Condon] was able to highlight that Dr. Perez's only contribution to the autopsy report was the one-line addendum which declared the manner of death a homicide, two months after the autopsy was conducted. Additionally, [Condon's] cross-examination allowed Dr. Perez to admit that the gunshot wound that caused [Sophie's] death could have been self-inflicted, which supports the defense's theory of the case. To prevail under *Strickland*, [Buccheri] must first establish that trial counsel's performance was deficient as measured by an objective standard of reasonableness. *Strickland*, *supra*, 466 U.S. at 687-688. [Buccheri] has only provided his lay opinion that a medical expert to disprove Dr. Perez's testimony was required. Further, [Buccheri] has neither identified an expert that would agree to testify, nor has set forth any specific position the expert could have taken to address or rebut Dr. Perez's testimony.

Next, [Buccheri] claims that he was prejudiced by [Condon's] failure to offer any medical expert opinion in support of [Buccheri's] assertion that he did not shoot [Sophie], but instead, that it was a self-inflicted death. Prong two of *Strickland* requires [Buccheri] to establish that had trial counsel called a medical expert, the result of the proceeding would have been different. Here, [Buccheri] cannot establish actual prejudice. [Buccheri] asserts that a defense medical expert should have been utilized, but does nothing to demonstrate how the expert would have refuted the scientific findings of the autopsy. Thus, [Buccheri] is unable to establish actual prejudice and his claim fails under both prongs one and two of *Strickland*.

(DE 13-19 at 9-13 (citations to trial court record omitted).)

The Appellate Division affirmed "substantially for the reasons explained" by the PCR court. *Buccheri*, 2017 WL 1207981, at *1. It did, however, also provide the following:

> The flaw that [the PCR court] found with [Buccheri's argument that Condon was ineffective in failing to retain and consult with an expert to rebut Dr. Perez] was that [Buccheri] provided no evidence that a defense expert could have disputed the State's medical expert. In other words, [Buccheri] presented nothing to the PCR court to show that had [Condon] consulted with a medical expert, that medical expert could have disputed the testimony of the State's expert.

> Without presenting evidence that an expert could have been consulted and retained, [Buccheri] is essentially asking the court to speculate. Such speculation cannot form the basis for a *prima facie* case of ineffective assistance of counsel.

*Id.* at *3.

Buccheri is not entitled to habeas relief on his Ground One IAC claim. In reaching that conclusion, the Court finds the Third Circuit's *Collins* decision, 742 F.3d 528, to be instructive. There, the § 2254 petitioner, Rodney Collins, was tried in Pennsylvania state court for first-degree murder. The Commonwealth's narrative at trial was that Collins shot the victim, Andre Graves, three times in the head at point blank range while "Graves sat in the front passenger seat and Collins sat in the backseat [of a station wagon]." *Id.* at 533.

> At the trial, the Commonwealth presented eye-witness testimony from [Kevin] Cofer [that he saw Collins shoot Graves at point blank range from the backseat of the vehicle]; ballistics testimony from Police Officer John Finor [that the murder weapon was fired no more than eighteen inches from the vehicle's front seat headrest] and a chemist named Ronald McCoy; testimony from a medical examiner, Dr. Gregory McDonald, [who, during his testimony] regarding the physical evidence from Graves's body[, stated that the trajectories of Graves's bullet wounds indicated that the shots were fired from the backseat]; and other testimony bearing on the events surrounding the murder[, including testimony from other witnesses indicating that Collins had been in the backseat of the car, with Cofer and Graves in the front]. Collins testified in his own defense. He told the jury that, on the day in question, after . . . Cofer dropped

him off and, while walking to his girlfriend's house, he heard gunshots. . . . Based on Collins's testimony and proposed inferences from the evidence, [his trial counsel, Louis Savino,] argued to the jury that the shots came from outside the car.

*Id.* at 533-34, 535, 537.

The jury ultimately convicted Collins of first-degree murder. *Id.* at 537. During his state court PCR proceedings, Collins asserted that Savino's representation of him was constitutionally deficient because, among other things, Savino failed to hire a ballistics expert. *Id.* at 538. To support that claim Collins presented his own ballistics expert, William Welch, who opined that Finor's ballistics-related testimony was unreliable. *Id.* However, on cross-examination at Collins's PCR hearing, "Welch conceded that the physical evidence was consistent with a shooter inside the car." *Id.* at 539. Ultimately, the state PCR court held that Collins was not entitled to relief under *Strickland* because he failed to demonstrate deficient performance or prejudice. *Id.* The court made this finding notwithstanding that Savino "confirmed [during PCR proceedings] that he interviewed no witnesses and did not consult any experts in preparation for [trial]." *Id.* at 538.

Collins unsuccessfully pursued this IAC claim further in the Pennsylvania state courts and in the federal district court, which, while denying § 2254 relief to Collins, certified to the Third Circuit the question of "whether Collins was deprived of his Sixth Amendment right to effective assistance of counsel because his trial counsel 'inadequately prepared for trial and completely failed to conduct any investigation, including into the ballistics evidence[.]'" *Id.* at 533. The Third Circuit found "Savino's approach to [Collins's] case [to be] in many ways deeply troubling." *Id.* at 547. In that regard, it took particular issue with Savino's efforts to defend his client based on the theory that "the shooter was . . . not Collins because the shots came from outside the car." *Id.* at 537. The fundamental problem with this theory, the *Collins* court noted, was that Savino did

not present any expert witnesses to refute the Commonwealth's assertion that the bullets that killed Graves were fired from the backseat – and therefore from within – the station wagon. The Third Circuit further noted that *Strickland* "provides a *two-pronged* test for reviewing [IAC] claims." *Id.* at 544 (emphasis added). In other words, a "petitioner must prove both (1) that "counsel's representation fell below an objective standard of reasonableness" and (2) that petitioner was prejudiced by that subpar performance." *Id.* (quoting *Strickland*, 466 U.S. at 688, 694). Ultimately, the Third Circuit, "[d]espite serious doubt that trial counsel conducted an adequate investigation, [found] that, given the uncontroverted evidence presented against Collins at trial, the state court determination that Collins failed to show he suffered prejudice was not an unreasonable application of [*Strickland*,]" *id.* at 532, and thus, Collins was not entitled to § 2254 relief. In so finding, the *Collins* court emphasized the following:

> Our decision about the lack of prejudice is not made lightly. Counterfactuals necessarily involve some speculation, and we cannot say with certainty that the result of Collins's trial would have been the same even if Savino had been better prepared for trial and hired appropriate experts. But that is not the standard we must apply. We look only far enough to determine if the state court reasonably applied federal law. *See* 28 U.S.C. § 2254(d)(1). We do not ask whether we "believe[ ] the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles*[ *v. Mirzayance*, 556 U.S. 111 at 123, 129 (2009) (citations and internal quotation marks omitted)]. On the whole, it was not an unreasonable application of federal law for the state court to say that Savino's failures—whether they be broadly described as a lack of preparation or confined to the ballistics evidence—did not raise a reasonable probability of a different outcome.[6]

*Id.* at 550.

---

[6] The *Collins* Court reached that conclusion without "rul[ing] on whether Savino's performance fell below the constitutional minimum of effectiveness." *Collins*, 742 F.3d at 547.

This Court now turns to the merits of Buccheri's Ground One claim. At the outset, the Court acknowledges that Dr. Lopez's testimony that Sophie was, in her expert opinion, the victim of a homicide appears to have been critical to the jury's decision to convict Buccheri for second-degree manslaughter. Indeed, Lopez's testimony may in fact have been *the* deciding factor that swayed the jury towards conviction given that Buccheri's case came down to whether the jury believed his version of events, *i.e.*, that Sophie accidentally shot herself, or the State's version, *i.e.*, that Buccheri pulled the trigger. However, at no point – not during his PCR proceedings nor during the pendency of his current habeas matter – has Buccheri ever presented any credible evidence, expert or otherwise, that refutes Dr. Lopez's testimony.[7] And "[a]n argument that rests almost entirely upon 'mays' and 'could haves' does not satisfy the requirements for habeas relief." *Chambers v. Sec'y Pennsylvania Dep't of Corr.*, 442 F. App'x 650, 657 (3d Cir. 2011) (quoting *Rice v. Hall*, 564 F.3d 523, 526 (1st Cir. 2009) (internal quotation marks altered).

Again, under *Strickland*, Buccheri "must prove both (1) that "counsel's representation fell below an objective standard of reasonableness" and (2) that petitioner was prejudiced by that subpar performance." 466 U.S. at 688, 694. Here, the Appellate Division correctly noted that

---

[7] Buccheri's failure to do so is particularly glaring when one considers that with the exception of the parties' retainer agreement – which Judge Isabella, after performing an *in camera* review, found lacked any information germane to Buccheri's IAC claims – Condon produced what appears to be the entirety of Buccheri's "rather voluminous" criminal trial file to PCR counsel. (*See* Oct 10, 2014 Hr'g 3, DE 13-40.) Moreover, even if the PCR court was incorrect in declining to order the production of the retainer agreement to PCR counsel – and nothing in the record supports such a finding – that error provides no basis for habeas relief. *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998) ("[T]he federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation."), *cert. denied*, 526 U.S. 1065 (1999); *see also Chambers*, 442 F. App'x at 657 ("Chambers alleged that his trial counsel was incompetent and that the discovery he sought would prove such incompetence. He has shown neither. An argument that rests almost entirely upon mays and could haves does not satisfy the requirements for habeas relief.") (citations and internal quotations omitted).

Buccheri "provided no evidence [which showed] that a defense expert could have disputed [Dr. Lopez's expert testimony]" and that "[w]ithout presenting evidence that an expert could have been consulted and retained, [Buccheri was] essentially asking the court to speculate [in a manner that could not] form the basis for a *prima facie* case of [IAC]." *Buccheri*, 2017 WL 1207981, at *3; *accord Chambers*, 442 F. App'x at 654 ("Whatever counsel may have gained by testing was and remains speculative [and thus, fails under *Strickland*] and may well have inculpated [the § 2254 petitioner,] in which case there was an affirmative, strategic reason not to seek it."); *Green v. Warren*, No. 12-6148, 2013 WL 6865420, at *18 (D.N.J. Dec. 20, 2013) (petitioner failed to establish that his counsel was ineffective where it was unclear whether expert reports would have been favorable). Moreover, the PCR court, in concluding that Buccheri failed to substantiate the prejudice prong of *Strickland*, expressly noted that Condon's cross-examination of Dr. Perez caused her to concede "that the gunshot wound that caused [Sophie's] death could have been self-inflicted, which support[ed] the defense's theory of the case." (DE 13-19.) Thus, unlike *Collins*, this was not a situation where trial counsel was pursuing a theory of defense completely at odds with the trial record. Furthermore, Buccheri does not aver that Condon's performance was deficient in any other way. Thus, unlike *Collins*, this is also not a situation where the record suggests that Condon's defense was "in many ways deeply troubling." *Collins*, 742 F.3d at 547.

In light of the foregoing considerations, this Court is unable to conclude that the state courts unreasonably applied *Strickland* to the facts of Buccheri's case. *Id.* at 543-44; *accord Blank v. D'Ilio*, No. 15-3596, 2018 WL 1919826, at *18 (D.N.J. Apr. 24, 2018) ("[U]nder the highly deferential standard of review governing ineffective assistance of counsel claims in § 2254 habeas matters, this Court is unable to find that the state courts' determination that Petitioner was not prejudiced by the failure of his trial counsel to retain an expert . . . represents an unreasonable

application of *Strickland* and its progeny, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.").  Indeed, "given the uncontroverted evidence presented against [Buccheri] at trial, the state court determination that [Buccheri] failed to show he suffered prejudice was not an unreasonable application of [*Strickland*]."  *Collins*, 742 F.3d at 532.  The Court will accordingly deny habeas relief as to Ground One.

## C. Grounds Three and Four: Purported Errors in Jury Instructions

Buccheri challenges the trial court's jury charge in two different respects.  First, he argues that the charge was deficient because it did not, as Buccheri now asserts, contain a charge on the affirmative defense of prevention of suicide under N.J.S.A. § 2C:7-7e.  (DE 1-1 at 9.)  Second, he claims that there was insufficient evidence to warrant an instruction – and resulting conviction – on passion/provocation manslaughter.  (*Id.* at 10.)  Buccheri's habeas petition incorporates the same arguments in support of Grounds Three and Four that he advanced on direct appeal.  (*See id.* at 9, 10.)  With respect to Ground Three, Buccheri again claims that "[t]he evidence in [his criminal] case demanded an instruction on the affirmative defense of prevention of suicide."  (DE 13-4 at 29.)  With respect to Ground Four, Buccheri claims that "[t]he jury instructions [improperly] failed to acknowledge Buccheri's defense that Rojas shot herself accidentally."  (*Id.* at 35.)  Buccheri, avers that the resulting charge to the jury was inadequate, improper, and ultimately "impaired Buccheri's constitutional right to present a complete defense [and] violated his right to a fair trial[.]"  (*Id.* at 29, 35.)

Questions relating to jury charges are normally matters of state law, and do not constitute claims for federal habeas review.  *See Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to re-examine state court determinations on state-law questions.").  Indeed,

"the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Id.* at 71-72. That said, "an error in the instructions to the jury" may nonetheless violate a criminal defendant's federal right to due process. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). In that regard, "[t]he only question [during habeas review] is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violate[d] due process . . . not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Id.* (citation and internal quotation marks omitted); *accord Waddington v. Sarausad*, 555 U.S. 179, 191 (2009); *Estelle*, 502 U.S. at 72. It is also "well established" that the challenged instruction "may not be judged in artificial isolation," but must be viewed in the context of the overall charge and the trial record. *Cupp v. Naughton*, 414 U.S. 141, 146 (1973).

Ultimately, it is the rare case in which "an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment." *Henderson*, 431 U.S. at 154; *accord Middleton v. McNeil*, 541 U.S. 433, 437 (2004) ("[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."). In order to obtain habeas relief, a petitioner must establish that the instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). For example, due process is violated where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (3d Cir. 1997); *see also Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (noting that due process is violated when "the instruction contained some ambiguity, inconsistency, or deficiency," and "there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of

proving every element of the crime beyond a reasonable doubt.") (internal quotation marks omitted).

As noted, Buccheri's § 2254 petition incorporates the same arguments in support of his Ground Three and Four claims that he advanced on direct appeal. (*See* DE 1-1 at 9, 10; *see also* Pet'r's Direct Appeal Br. at 29-43, DE 13-4.) The Appellate Division provided the following extensive analysis in rejecting those claims:

> [Buccheri] contends that the [trial] court should have *sua sponte* charged the jury on the affirmative defense of prevention of suicide, N.J.S.A. 2C:3–7(e). This argument is without merit. [N.J. Ct.] R. 2:11–3(e)(2). In the first place, the defense does not permit deadly force to prevent suicide and, in any event, it is not rationally based in, much less clearly indicated by, the trial evidence.
>
> N.J.S.A. 2C:3–7(e) provides that "[t]he use of force upon or toward the person of another is justifiable when the actor reasonably believes that such force is immediately necessary to prevent such other person from committing suicide [or] inflicting serious bodily harm upon himself[.]" However, there is an exception for the use of deadly force:
>
>> The use of deadly force is not in any event justifiable under this subsection unless the actor reasonably believes that it is likely that the person whom he seeks to prevent from committing a crime will endanger human life or inflict serious bodily harm upon another unless the commission or the consummation of the crime is prevented and that the use of such force presents no substantial risk of injury to innocent persons.
>>
>> [N.J.S.A. 2C:3–7(e)(2).]
>
> In the only case addressing this provision, we stated that the provision
>
>> "appears to be a separate justification for force used to prevent crime, but that appearance is largely illusory." Cannel, Criminal Code Annotated, Comment N.J.S.A. 2C:3–7 at 192 (2000–2001). "The subsection merely incorporates other relevant

> sections, . . . and its deadly force provision is a restatement of [N.J.S.A.] 2C:3–4 and [N.J.S.A.] 2C:3–5 with the additional limitation that there be no substantial risk to innocent persons." *Ibid.*
>
> [State v. Hogan, 336 N.J. Super. 319, 349 (App. Div.), *certif. denied*, 167 N.J. 635 (2001).]

In other words, the statute permits force to prevent a crime or a suicide, and even allows deadly force to save the innocent from a potentially lethal attack by a third party; but under no circumstances does it permit killing someone to prevent that person from killing him—or herself. To argue otherwise is absurd as it would create a risk of death equal to the risk sought to be avoided, and that risk is unjustifiable.

But even if such a defense were available, it was not rationally based in the trial evidence. Although [Buccheri] points to his statement that the gun went off as he approached Sophie to prevent her from shooting herself, he never stated that he used forced against her. At most, "he tried to get to her, but she had the gun in her hand already, and she was stating that this is what she want[s]." In fact, [Buccheri's] own statements to the police indicate that he did not touch Sophie until after she had shot herself, at which point he held her and tried to stop the bleeding. Also absent is any proof that a third person was endangered by Sophie's actions. Thus, accepting [Buccheri's] own version of the facts, he did not even use force to prevent the suicide, and therefore the N.J.S.A. 2C:3-7(e) defense is simply not applicable.

[Buccheri] also contends that the trial court should have *sua sponte* instructed the jury on the defense theory that Sophie shot herself accidentally. There was no error here, much less plain error, since no such instruction was necessary. *See State v. Hock*, 54 N.J. 526, 538 (1969), *cert. denied*, [399 U.S. 930] (1970).

In *State v. Giberson*, 153 N.J. Super. 241, 246 (App. Div. 1977), the court held that the defendant's theory of an accidental stabbing did not require a special instruction, and that a "sufficient instruction was inherent in the judge's statement as to the elements of the crime of atrocious assault and battery which the State was required to prove beyond a reasonable doubt."

While sometimes it may be appropriate and necessary to tailor a charge to the facts of the case in order to guide the jury's deliberations, a failure to do so will likely not amount to prejudicial

error where "the facts of the case and the claims of the State and the defense [are] quite clear." *State v. Angoy*, 329 N.J. Super. 79, 85 (App. Div.), *certif. denied*, 165 N.J . 138 (2000). The "failure to tailor a jury charge to the given facts of a case constitutes reversible error where a different outcome might have prevailed had the jury been correctly charged." *Reynolds v. Gonzalez*, 172 N.J. 266, 289 (2002).

Here, the facts were not complex and the parties' conflicting versions were clear. Two people were in the bedroom when Sophie suffered a fatal gunshot and the only question was the shooter's identity. The jury needed no special instruction to guide their analysis of that issue. Indeed, they were made aware of the defense theory throughout the trial through [Buccheri's] various statements to police that Sophie shot herself accidentally, and those statements were highlighted for the jury during his counsel's summation.

Moreover, that the victim may have caused her own death accidentally is not a "separate" or "affirmative" defense requiring a special instruction. Rather, the claim is simply an attack on the State's proofs, namely that someone other than [Buccheri] committed the crime. Yet for each of the homicide and weapons charges, the trial judge correctly instructed the jury that the State was required to prove beyond a reasonable doubt that [Buccheri] caused Sophie's death and that he possessed the gun used to kill her. Thus, given that [Buccheri's] position was clear and the facts uncomplicated, no special instruction of the defense theory of the case was required.

In yet another first-time challenge to the court's instructions, [Buccheri] argues there was insufficient evidence to charge passion/provocation manslaughter as a lesser-included offense of murder. We disagree.

In his motion for a judgment of acquittal and a new trial, [Buccheri] argued that the manslaughter verdict was against the weight of the evidence. The judge disagreed, reasoning:

> Additionally, prior to all the above evidence, testimony established a verbal and physical alter[c]ation between the victim and [Buccheri] which commenced at a barbecue attended by motorcycle club members. [Buccheri] appeared to be intoxicated, and the decedent broke up a fight between [Buccheri] and another person. [Buccheri]

was apparently very upset by her conduct, and the victim insisted he not drive.

Also, testimony was admitted that the victim's child was driven home by other persons attending the barbecue, apparently due to her concern about [Buccheri's] drinking. [Buccheri] had attempted to drive and caused the vehicle to become "wedged" on a parking "stop." The victim then proceeded to drive home. Once the couple arrived home, witnesses testified [Buccheri] was driving and the victim was very upset, crying, and had marks on her face which appeared to show she had been "slapped."

We agree.

A trial court "shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." N.J.S.A. 2C:1–8(e); *State v. Cassady*, 198 N.J. 165, 178 (2009). "Although a 'rational basis' requires more than a mere 'scintilla of evidence,' it is '[n]evertheless . . . a low threshold.'" *State v. Erazo*, 126 N.J. 112, 123 (1991) (quoting *State v. Crisantos*, 102 N.J. 265, 278 (1986)). It is the court's independent obligation to instruct on the lesser-included offense "when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense." *State v. Jenkins*, 178 N.J. 347, 361 (2004).

Murder is defined as a criminal homicide committed by an actor who purposely or knowingly causes death or serious bodily injury resulting in death. N.J.S.A. 2C:11-3(a)(1)-(2).

Passion/provocation manslaughter is a lesser-included offense of murder. *State v. Robinson*, 136 N.J. 476, 482 (1994). It is defined as "[a] homicide which would otherwise be murder under section 2C:11-3 . . . committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11–4(b)(2). Passion/ provocation manslaughter has four elements: "(1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying." *State v. Josephs*, 174 N.J. 44, 103 (2002). The first two elements are objective, and if they are supported by the evidence, the trial court should give an instruction on the offense and leave determination of the remaining two subjective elements to the jury. *Ibid.*

In *State v. Mauricio*, 117 N.J. 402 (1990), the Court found evidence of passion/provocation manslaughter sufficient to require a jury instruction on the offense where the defendant had been engaged in two violent physical confrontations with a bouncer in the space of about twenty minutes, and shot the bouncer over half an hour later. *Id.* at 414-15; 417-18.

Here, as well, we find a rational basis in the evidence to support a jury charge on passion/provocation manslaughter. There is proof that [Buccheri] and Sophie were engaged in a heated exchange that began at the barbeque, continued throughout the ride home and into the evening, eventually culminating in her death. There is also evidence that both had been drinking to the point Sophie was concerned about [Buccheri] driving her home. Whatever the nature of the argument at its inception, the fight escalated into a mutually violent domestic battle, as both sustained visible injuries. As to Sophie, she had been smacked, scratched and some of her hair had been pulled out, and her autopsy revealed blunt force trauma to her abdomen, consistent with a struggle. Suffice it to say, the evidence and inferences therefrom are consistent with adequate and reasonable provocation with little time, if any, for [Buccheri] to cool off. There was, accordingly, a rational basis upon which a jury could, and did, conclude that [Buccheri] killed Sophie in the heat of passion arising from a reasonable provocation.

*Buccheri*, 2013 WL 844362, at *10-13.

As an initial matter, the Court agrees, based on its independent review of Buccheri's trial record, that "accepting [Buccheri's] own version of the facts, he did not even use force to prevent [Sophie's purported] suicide[.]" *Id.* at *10. It accordingly follows, for substantially the same reasons expressly noted by the Appellate Division, that "the N.J.S.A. 2C:3–7(e) defense [was] simply not applicable" in Buccheri's case. *Id.* The Court likewise agrees with the Appellate Division that it was unnecessary for the trial court to "*sua sponte* instruct[] the jury on the defense theory that Sophie shot herself accidentally" because, as the record convincingly demonstrates, the "[the jury was] made aware of the defense theory throughout the trial . . . that Sophie shot herself accidentally[.]" *Id.* at *11. Furthermore, this Court is in agreement that there was a "rational basis

in the evidence to support a jury charge on passion/provocation manslaughter" and "a rational basis upon which a jury could, and did, conclude that defendant killed Sophie in the heat of passion arising from a reasonable provocation." *Id.* at *13.

Ultimately then, no portion of the jury charge – including the portions specifically being challenged by Buccheri on habeas review (*see* Aug. 12, 2010 Jury Charge Tr. 5-18, DE 13-36) – "by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (citing *Cupp*, 414 U.S. at 147) (internal quotations omitted); *Harris v. D'Ilio*, No. 15-1603, 2018 WL 2148894, at *7 (D.N.J. May 10, 2018) ("The Court has carefully reviewed the jury instructions on murder and passion/provocation manslaughter, and finds no error of constitutional magnitude in this case. The trial judge clearly instructed the jury about the State's burden of proof as to the elements of murder, more than once, and made clear that the State bears the burden to prove beyond a reasonable doubt that Petitioner did not act in the heat of passion— the third element of the offense of murder."); *Grissom v. Mee*, No. 10-1468, 2012 WL 2050240, at *10 (D.N.J. June 5, 2012) (denying habeas relief based on purported errors in a similarly-worded jury instruction regarding passion/provocation manslaughter and murder).

In light of the foregoing considerations, this Court concludes that the Appellate Division's prior rejection of the claims being advanced by Buccheri in Grounds Three and Four was neither contrary to, nor an unreasonable application of, clearly established federal law, or that its rulings with respect to those claims represented an unreasonable determination of the facts in light of the evidence presented during Mr. Buccheri's state court proceedings. Buccheri is therefore not entitled to habeas relief based on these claims.

**D. Ground Five: Prosecutorial Misconduct**

In Ground Five, Buccheri seek habeas relief based on an isolated comment made by Assistant Prosecutor Leonardo Rinaldi during his closing argument.  During summation, Rinaldi emphasized the significance of Buccheri's 911 call to the State's case.  In so doing, Rinaldi noted, the following, among other things, about that call:

> You know what's important that you won't hear [during that call]?  You won't hear Sophie.  She's coughing, vomiting blood [Buccheri] says to the EMT operator.  He's checking for a pulse, he's this far away, you don't hear her coughing blood, you actually don't hear anything.

> You hear the police come in downstairs, that get's picked up.  Why?  I say because [Buccheri] waited until Sophie was dead to call 911.  He waited because she could still speak, he didn't want the police to show up and tell them what happened.[8]

> These are inferences you can draw from the evidence, from the time it took the police to get there from the 911 call.  From what you hear and do not hear on that tape.

(Aug. 11, 2010 Trial Tr. 115-16, DE 13-35.)

Buccheri claims that "[i]t was flagrant misconduct for the prosecutor to manufacture the charge that [Buccheri] waited until [Sophie] was dead to call 911." (*See* DE 1-1 at 11.)  Relevant Court precedent makes clear that Buccheri may be entitled to habeas relief if Rinaldi's now-challenged comment "'so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  In other words, Rinaldi's purported "prosecutorial misconduct must be 'of sufficient significance to result in the denial of [Buccheri's] right to a fair

---

[8] During closing, Rinaldi expressly noted that the evidence adduced at trial showed that: (1) Buccheri called 911 at 7:43 p.m. (Aug. 11, 2010 Trial Tr. 85, DE 13-35); (2) that Jersey City police arrived at the scene at 7:49 p.m. (*id.* at 88); and (3) that it was not until 8:02 p.m. that Sophie was formally pronounced dead (*id.* at 91).

trial.'" *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 676, (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976))); *accord Werts v. Vaughn*, 228 F.3d 178, 197-98 (3d Cir. 2000); *Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir. 1992).

Buccheri, as he did on direct appeal, argues that "[Rinaldi's] specious and objectionable argument was designed to persuade the jury to [convict Buccheri for] the purposeful crime of murder [and]. . . . may have influenced the jury to return a verdict for the purposeful crime of passion/provocation manslaughter rather than an acquittal." (*See* DE 13-4 at 45; *see also* DE 1-1 at 11 (Buccheri incorporating this argument by reference).) The Appellate Division, in concluding that Rinaldi's again-challenged comment provided no basis to overturn Buccheri's conviction and sentence, provided the following explanation and analysis:

> [W]e apply the plain error standard to [Buccheri's prosecutorial misconduct] claim as he failed to object to these remarks at trial. In this context, to amount to reversible error, the prosecutor's conduct must be "so egregious as to deprive defendant of a fair trial." *State v. Timmendequas*, 161 N.J. 515, 575 (1999). It "must have been clearly and unmistakably improper, and must have substantially prejudiced [Buccheri's] fundamental right to have a jury fairly evaluate the merits of his defense. . . . Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." *Id.* at 575-76 (internal quotation marks and citations omitted); *see also State v. Ingram*, 196 N.J. 23, 42-43 (2008). On this score, we note that prosecutors are given considerable leeway in closing arguments so long as their comments are reasonably related to the evidence in the record and reasonable inferences drawn therefrom. *State v. Daniels*, 182 N.J. 80, 99 (2004); State v. Frost, 158 N.J. 76, 82 (1999).

> With this in mind, we are satisfied that [Rinaldi's] challenged comment was based on reasonable inferences derived from the evidence in the record. First, the prosecutor did not misrepresent any of the evidence in the record. He correctly noted that had Sophie been coughing up blood as [Buccheri] told the dispatcher, the 911 recording would have picked it up since [Buccheri] was in the same room as the victim, just as the police could be heard in the recording coming into [Buccheri's] house downstairs. Moreover, based on [Buccheri's] statements to the dispatcher, it appears he was

> conveying that Sophie was alive at the beginning of the call but dead
> seconds later. Yet, this time sequence is contradicted by Dr. Perez's
> testimony that Sophie's death was not instant but slow, over a few
> minutes, during which Sophie, who was in pain, would have
> screamed or made other audible noises that would have been
> recorded. Given these facts, the State was clearly entitled to draw
> the reasonable inference, as could the jury, that [Buccheri] called
> 911 after Sophie had died.

*Buccheri*, 2013 WL 844362, at * 13-14.

Buccheri has not presented the Court with any basis to find that the Appellate Division's resolution of his Ground Five claim is contrary to, or otherwise represents an unreasonable application of, relevant Supreme Court precedent, or that this decision is the result of an unreasonable determination of the facts before it. This Court is likewise unable to independently find any basis to conclude that Rinaldi's one-off comment during summation was improper, much less that this isolated statement so infected Buccheri's trial with unfairness so as to make his resulting conviction a denial of due process. The Court will accordingly deny habeas relief on Ground Five.

### E. Certificate of Appealability

A petitioner whose detention arises out of his state court conviction may not appeal from a final order in his habeas proceeding unless he has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Buccheri has failed to make a substantial showing that he was denied a constitutional right.

As reasonable jurists could not disagree with this Court's resolution of Buccheri's habeas claims, the Court shall deny him a certificate of appealability.

## V.        CONCLUSION

For the reasons stated above, Buccheri's habeas petition and his related request for an evidentiary hearing are both denied.  No certificate of appealability shall issue.  An appropriate Order accompanies this Opinion.

8/6/2019                                                          s/ John Michael Vazquez
Date                                                               JOHN MICHAEL VAZQUEZ
                                                                       U.S. District Judge